# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-06-00328-CV

**MFC Finance Company of Texas, Appellant**

**v.**

**Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas, and Greg Abbott, Attorney General of the State of Texas, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT NO. D-1-GN-00-002653, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

This is an appeal from a summary judgment in a tax refund suit to recover motor vehicle sales tax with interest. The issue presented is whether a company that purchased installment-sales contracts from retail motor vehicle dealers could avail itself of the bad debt refund statute after the obligors defaulted. We will affirm the district court's judgment.

## BACKGROUND

MFC Finance Company of Texas, a subsidiary of Mercury Finance Company, was in the business of buying installment-sales agreements from motor vehicle dealers. Sixteen thousand such contracts purchased by MFC are at issue in this case. Under each of these contracts, the motor vehicle purchasers made down payments and/or trade-ins and agreed to pay the dealer the remainder of the purchase price, plus interest, fees, and sales tax, in installments over periods ranging from

3 to 48 months. The dealers retained liens on the vehicles. Each installment payment included, among other components, a portion of the principal amount owed on the debt, as well as the sales tax owed on the purchase price.

Upon receipt of each installment payment, the dealers were then obligated to remit the sales tax amount to the comptroller.[1] *See* Tex. Tax Code Ann. § 152.047(e) (West Supp. 2007).[2] However, the tax code provides that if the dealer assigns or transfers its right to payments under a contract, it is then required to pay in full the total amount of sales tax remaining due on the sale of the vehicle. *See id.* § 152.047(g) (West Supp. 2007). When purchasing the installment-sales agreements, MFC would pay each dealer a lump-sum amount reflecting the value of future payments (including the principal, interest, and sales tax components) discounted for the risk MFC assumed—that the obligor would default. In exchange, the dealer assigned its rights, title, and interest in the contract to MFC.

Under each of the sixteen thousand installment contracts at issue here, the obligor defaulted. The vehicles were repossessed and sold, and the unpaid portion that remained after the resale, including the corresponding portion of the motor vehicle tax owed, was entered as bad debt on MFC's books and reported as a loss on MFC's federal income tax returns from 1996 through 1999.

---

[1] We substitute Susan Combs, in her official capacity, as successor to Carole Keeton Strayhorn, Comptroller of Public Accounts of the State of Texas. *See* Tex. R. App. P. 7.

[2] For convenience, where statutory language cited or referred to is unchanged, we will cite to the current version of the statute.

In March 1999, MFC filed a refund claim with the comptroller for sales taxes paid but never collected. *See* Act of May 6, 1983, 68th Leg., R.S., ch. 235, art. 7, § 6, 1983 Tex. Gen. Laws 983, 1043-44 (amended 1999) (current version at Tex. Tax Code Ann. § 151.426(c) (West 2002)). The total refund requested for all tax years at issue was $4,726,696.19. The comptroller denied MFC's refund claim. After timely filing its motion for rehearing with the comptroller, the comptroller denied MFC's motions, and MFC appealed to the district court. The parties filed cross motions for summary judgment. In its motion for summary judgment, MFC argued that it was entitled to a refund of the motor vehicle sales tax under the tax code's bad debt statute, while the comptroller argued that MFC has no statutory right to a refund. In addition to the parties' statutory construction issues, the comptroller's motion included a no-evidence ground. The comptroller argued that there was no evidence that the dealers qualified as seller-financiers under the tax code or that the dealers had remitted the tax to the comptroller. Without specifying the grounds, the district court granted the comptroller's summary judgment and denied MFC's motion for partial summary judgment. MFC appeals.

**DISCUSSION**

**Standard of review**

When the parties file cross-motions for summary judgment and the trial court grants one motion and denies the other, an appellate court should review the summary judgment evidence supporting each motion and determine all questions presented. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000). The appellate court "should render the judgment that the trial court should have rendered." *Id.* If the trial court's order does not specify the grounds

3

upon which it granted summary judgment, the appellate court "must affirm summary judgment if any of the summary judgment grounds are meritorious." *Id.*

The issues in this case turn principally on statutory construction. Statutory construction presents a question of law that we review de novo. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). We seek to discern the legislature's intent, as manifested first and foremost in the statutory text. *Id.* We ascertain the legislature's intent from the plain meaning of the words chosen when possible. *Id.* To that end, we consider statutory language in context, not in isolation. *Jones v. Fowler*, 969 S.W.2d 429, 432 (Tex. 1988); *see* Tex. Gov't Code Ann. § 311.011(a) (West 2005). Statutes are to be read as a whole and interpreted to give effect to every part. *City of San Antonio v. City of Boerne*, 111 S.W.3d 22, 26 (Tex. 2003). We also presume that the legislature acted with knowledge of the background law. *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990). Words and phrases that have acquired a technical or particular meaning shall be construed accordingly. Tex. Gov't Code Ann. § 311.011(b). When ascertaining legislative intent, we may also consider the objective of the law, its history, and the consequences of a particular construction. *Id.*; *see also id.* § 311.023(1), (3), (5) (West 2005).

**Applicability of the bad debt refund statute**

MFC argues that because a portion of the total sales tax due on the installment sales in question was included as a component of each installment payment, a portion of MFC's purchase price paid to the dealers from which MFC purchased the installment contract reflected anticipated sales tax collections under the contract, and MFC is entitled to a refund of any portion of this amount that it did not collect from the obligors under each contract. It relies on

4

the bad debt refund statute, which is found in chapter 151 of the tax code, the code's general sales tax chapter. At relevant times, it provided:

> (c) A retailer is entitled to credit or reimbursement for taxes paid on the portion of:
>
> > (1) an account determined to be worthless and actually charged off for federal income tax purposes; or
> >
> > (2) the remaining unpaid sales price of a taxable item when the item is repossessed under a conditional sales contract.

art. 7, § 6, 1983 Tex. Gen. Laws at 1043-44. The comptroller argues—and MFC does not dispute—that MFC is not a "retailer" under chapter 151 of the tax code and the bad debt refund statute. *See* Tex. Tax Code Ann. § 151.008(a) (West 2002) (defining a "seller" or "retailer" as "a person engaged in the business of making sales of taxable items of a kind the receipts from the sale of which are included in the measure of the sales or use tax imposed by this chapter"). It is also undisputed that MFC did not itself remit sales tax to the comptroller. Instead, MFC asserts that it can claim the bad debt refund as an assignee of the motor vehicle retailers or dealers who originally executed the installment sales contracts. The comptroller responds that because the motor vehicle dealers never had or could have a right to a bad debt refund, they had no such right to assign to MFC. MFC replies that (1) the dealers qualify as "seller-financiers" under chapter 152 of the tax code; (2) chapter 152's provisions governing seller-financiers incorporate the bad debt provision from chapter 151 so as to entitle seller-financiers to refunds under the bad debt statute; and (3) under common-law principles, the motor vehicle dealers could assign their bad debt refund rights to MFC.

5

Assuming without deciding that, as MFC contends, the motor-vehicle dealers qualify as "seller-financiers,"[3] MFC's theory hinges on the following provision of chapter 152:

Collection of Tax on Seller-Financed Sale

(a)    Except as inconsistent with this chapter and rules adopted under this chapter, the seller of a motor vehicle shall report and pay the tax imposed on a seller-financed sale to the comptroller on the seller's receipts from seller-financed sales in the same manner as the sales tax is reported and paid by a retailer under Chapter 151.

See Act of April 6, 1993, 73rd Leg., R.S., ch. 29, § 4, 1993 Tex. Gen. Laws 66, 66-67 (amended 2007) (current version at Tex. Tax Code Ann. § 152.047(a) (West Supp. 2007)). MFC urges that this provision incorporates chapter 151's bad debt refund provision because there is no bad debt refund provision in chapter 152 with which section 151.426 would be "inconsistent." However, the comptroller points to other provisions of chapter 152 that are inconsistent with the existence of a claim by a seller-financier for a bad debt refund.

The tax code requires the seller of a motor vehicle to report and pay to the comptroller motor vehicle sales tax on a seller-financed sale. Id. The seller need only remit these taxes as the proceeds of the sale are received. Tex. Tax Code Ann. § 152.047(e). This statutory framework, as the comptroller observes, is inconsistent with the possibility of a bad debt refund claim. Because the seller is required to remit motor vehicle taxes only as proceeds are received, it would not pay

_____

[3]    See Act of April 6, 1993, 73rd Leg., R.S., ch. 29, § 4, 1993 Tex. Gen. Laws 66, 66-67 (amended 2007) (current version at Tex. Tax Code Ann. § 152.047(a) (West Supp. 2007)); Tex. Tax Code Ann. § 152.065 (West 2002) (requiring a seller-financier to hold a motor vehicle sales tax permit issued by the comptroller).

sales taxes that it had not collected and that might later become the basis for a bad debt refund claim. Chapter 152, in other words, contemplates that if proceeds are not received, taxes are not paid.

Only if the seller assigns or transfers its right to receive payment does all sales tax become due immediately. *Id.* § 152.047(g). When the seller receives payment for transfer of its right to payment, it is required to remit all taxes due on the vehicle at that time. Even in this situation, however, no right to a bad debt refund arises because the seller remits taxes only after assigning and being paid for his right to receive future payments.

Here, the dealers typically sold their rights to receive payment to MFC at a five to ten percent discount. In return, MFC assumed the risk that purchasers would ultimately be unable to make payment on the contracts. Those payments represented not only sales proceeds but also sales taxes. The discounted price MFC paid reflected the risk that these payments might not occur. MFC's claim in effect seeks compensation for a loss for which it assumed the risk in its transactions with motor vehicle dealers.

MFC also emphasizes that motor vehicle lessors are entitled to bad debt refunds under a statute similar to the tax code provision governing seller-financiers. As noted, section 152.047(a) of the tax code, governing seller-financiers, provides:

> Except as inconsistent with this chapter and rules adopted under this chapter, the seller of a motor vehicle shall report and pay the tax imposed on a seller-financed sale to the comptroller on the seller's receipts from seller-financed sales in the same manner as the sales tax is reported and paid by a retailer under Chapter 151.

§ 4, 1993 Tex. Gen. Laws at 66-67. Section 152.045(a) of the tax code, governing motor vehicle lessors, similarly provides:

7

Except as inconsistent with this chapter and rules adopted under this chapter, an owner of a motor vehicle subject to the tax on gross rental receipts shall report and pay the tax to the comptroller in the same manner as the Limited Sales, Excise and Use Tax is reported and paid by retailers under Chapter 151 of this code.

Tex. Tax Code Ann. § 152.045(a) (West 2002). The comptroller's rule accompanying section 152.045 states:

A retailer who has previously paid motor vehicle gross rental receipts tax may take a deduction or seek a credit for the tax paid on the gross rental receipts that are determined uncollectible if the uncollectible amount is entered on the retailer's books as a bad debt and claimed as a deduction for federal income tax purposes.

34 Tex. Admin. Code § 3.78(c)(1)(B) (West 1996). The comptroller has not adopted a similar rule as to seller-financiers.

MFC urges that because of the textual similarities between sections 152.045(a) and 152.047(a), the comptroller is required to interpret the two provisions in the same way and permit seller-financiers to take a bad debt deduction for the sales taxes paid on installments payments that become uncollectible. However, we are required to consider sections 152.045(a) and 152.047(a) not in isolation, but in context with the statutory scheme as a whole. *City of San Antonio*, 111 S.W.3d at 26. As explained above, the legislature has made seller-financiers responsible for reporting and paying motor vehicle sales tax only as proceeds are received, a statutory scheme that does not contemplate claims for bad debt refunds. Tex. Tax Code Ann. § 152.047(g). In contrast, the legislature has required motor vehicle lessors to add the tax to its rental charge. *Id.* § 152.045. The tax becomes "a part of the rental charge" and "a debt owed to the motor vehicle owner by the person renting the vehicle." *Id.* Thus, the tax must be remitted by the lessor at the time the rental charge

8

is incurred, which is not necessarily at the same time that the lessor receives payment from the lessee. Consequently, the legislature contemplated that a motor vehicle lessor, unlike a seller-financier, could pay sales tax on rentals yet ultimately not be able to recover the tax from the lessees. These differences in the statutes governing motor vehicle lessors versus seller-financiers support the comptroller's different interpretations of what, in isolation, appears to be similar language in section 152.045 and 152.047.[4]

Because the dealers have no claim to a bad debt refund under the tax code, no claim can be assigned to MFC. *See Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 420 (Tex. 2000) (explaining that the assignee stands in the shoes of the assignor and may assert only those rights that the assignor could assert). The district court did not err in granting summary judgment for the comptroller on this ground and denying MFC's motion for partial summary judgment.

**Other issues**

MFC argues that the comptroller's summary judgment arguments are based on subsequent amendments to the tax code rather than the version that governs this case. The foregoing analysis is based on the law in effect at the time MFC's refund claim arose. We accordingly need not reach the parties' contentions regarding the implications of the subsequent amendments.

MFC further asserts that the district court erred in granting the comptroller's no-evidence motion for summary judgment because MFC has produced some evidence that the dealers

---

[4] In light of these differences in the statutory schemes governing motor vehicle sellers and motor vehicle lessors, we likewise reject MFC's arguments based on "legislative acceptance" of the comptroller's interpretation of section 152.045(a). We similarly conclude that the comptroller's differing interpretations are neither unreasonable or unconstitutional.

were seller-financiers and that they remitted the tax to the comptroller. Because we have assumed in our analysis that the dealers were seller-financiers and did remit sales taxes, we need not reach these contentions.

## CONCLUSION

We affirm the judgment of the district court.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   May 1, 2008